UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| KEVIN CURRINGTON AND TERRI JEAN CURRINGTON H/W, | : | CIVIL ACTION NO.: |
| | : | |
| and | : | |
| | : | |
| HUNTER GALLY, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| SIG SAUER, INC., | : | |
| | : | |
| Defendant. | : | JURY TRIAL DEMANDED |

## **COMPLAINT**

### **Introduction**

The Sig Sauer P320 is a tragic example of what happens when a company maximizes revenue and executive compensation at the expense of quality control and human safety. Despite overwhelming evidence that the P320 can and has fired without the trigger being pulled, from 2014 to the present, Sig Sauer. Inc. ("Sig") has continued to market the firearm, putting and leaving a lethally defective product in the hands of unsuspecting police officers and civilians, around the country.

The disregard for human safety has led to severe injuries, lifelong disabilities, disfigurement and death, leaving innocent victims, including police officers Currington and Gally, to bear the consequences of the company's refusal to put safety first. Rather than recall the weapon, or issue a clear safety warning about it, year after year Sig has denied responsibility, spent millions on legal fees rather than compensating victims, disparaged victims as incompetent, and generally shirked its duty of care to the public and law enforcement for the last 10 years.

## NATURE OF ACTION

1.     Upon information discovered through research, litigation and document production over the last eight years, the Sig Sauer P320 is the most dangerous pistol sold in the United States yet has not been recalled.

2.     The P320 is the first striker-fired gun[1] Sig produced.  In an interview in 2017 with Soldier Systems Daily, Sig explained that it had avoided producing one for many years due to concerns with disassembly and "accidental,"[2] i.e., un-commanded, discharges.

3.     Those concerns turned out to be justified.  In as early as 2013, Sig assessed the risk of the P320's design and identified multiple unintentional discharge risks.

4.     For example, Sig was fully aware of at least two defective drop discharges of the P320 in December 2013 at its own headquarters that occurred during private internal testing. While testing, Sig's technicians "encountered primer ignition" after dropping the P320 pistol on "a couple" of occasions, including in December 2013 and April 2014, "and the engineers were immediately notified."

5.     Despite this knowledge, Sig put the P320 into commerce just three months later anyway, and expressly informed consumers that it was "drop safe."  When it drop fired while holstered and shot a Stamford, Connecticut, SWAT member in January 2017, Sig denied under oath that it had any knowledge of prior drop fires of the gun.

---

[1]  A striker-fired pistol is different from a hammer-fired pistol.  It contains no external hammer to be pulled back by the user's thumb.  Rather, it has an internal "striker" that is held back under substantial spring pressure much like a crossbow.

[2]  In gun industry parlance, an accidental discharge involves no negligence though it implies it to the casual listener. "An accidental discharge (AD) occurs when there is a mechanical failure of the firearm.  This can include things like firearms that do not have mechanisms to render them drop safe falling a sufficient distance, a firing pin stuck forward, a sear failing, or rounds heating sufficiently to spontaneously ignite in the chamber)". https://en.wikipedia.org/wiki/Unintentional_discharge

6.      Sig knew, as early as 2014 and possibly earlier, that defective discharges caused by cumulative or sudden vibration, inertial impulses, drops and/or slight trigger actuations by foreign objects were a known risk of the P320's single action, fully cocked design.  A review of Sig's own testing documentation, patent documents and press releases makes this clear.

7.      Sig knew that unintended trigger actuation by a foreign object such as a holster wall coming into contact with the P320's unprotected trigger could result in defective, unintended discharges causing severe injury or death.

8.      Sig also knew of the ability of the pistol's precarious striker foot-sear engagement to disengage, leading to an unintentional discharge merely upon repeated inertial impulses to the gun's slide, frame and fire control unit.

9.      Sig scrambled behind the scenes for a solution to the problem of unintended discharges as incidents continued to multiply around the country.  As incidents continued to multiply around the country, Sig scrambled behind the scenes for a solution.  It applied for a patent in 2017 to modify the pistol to include a "back-up" sear wall to catch the striker if the primary, spring-tensioned engagement failed, which Sig knew could happen and was happening in the real world.

10.      Sig knew as early as February 2016 if not earlier that the risks of the P320's design could result in the severe injury or death of its users and user bystanders, including law enforcement officers and civilians.

11.      Tragically for the plaintiffs, Officers Currington and Gally, Sig's own risk analysis of its defectively designed P320 was proven right with both nearly losing their lives when their holstered P320s discharged in Texas in May and September of 2024, respectively.  Each plaintiff

was merely doing his job with a holstered P320 at  his side when the discharges occurred with neither plaintiff's hands near  his holstered gun.

12.    Officers Currington and Gally trusted Sig to live up to its widely advertised and marketed reputation as a designer and manufacturer of safe and reliable handguns.

13.    What Currington and Gally did not know, however, was that on top of producing a single action pistol with no external safety, Sig was also importing inexpensive and unfinished MIM parts from India and dropping them unfinished or "raw" into the fire control unit of the P320s.  Sig saved money by failing to machine the surface faces of these parts smooth to ensure a stable strike-sear connection.

14.    Those parts, moreover, substantially deviated from Sig's own component level drawings of how the parts should look.

15.    Like so many others, Officers Currington and Gally trusted Sig to live up to its promise that the P320 "would not fire unless you want it to."

16.    Both put their trust in Sig to manufacture and provide a reasonably safe firearm. Sig let them down, as the company has done to many others.

17.    Plaintiffs seek damages, including compensatory and enhanced compensatory damages, for their severe injuries, medical expenses and emotional trauma, and Sig's long running coverup of lethal defects in the P320.

## **PARTIES**

18.    Plaintiff Kevin Currington is an adult individual, citizen and resident of the State of Texas, residing in West Point, Texas.

19.    Plaintiff Terri Jean Currington is the wife of Currington, an adult individual, citizen and resident of the State of Texas residing at the same location.

20.     Plaintiff Hunter Gally is an adult individual, citizen and resident of the State of Texas, residing in Burnet, Texas.

21.     Defendant, Sig Sauer, Inc. is a corporation or other business entity with its principal place of business at 72 Pease Boulevard in Newington, New Hampshire 03801, organized and incorporated under the laws of Delaware.

## JURISDICTION AND VENUE

22.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  There is perfect diversity of citizenship between the parties.  The defendant is a resident of the state of New Hampshire.  Each plaintiff resides in a state other than New Hampshire.  The court may exercise personal jurisdiction over the defendant Sig because it is a resident of New Hampshire.

23.     Venue is proper because a substantial part of the acts and omissions giving rise to the action occurred in New Hampshire.

## GENERAL ALLEGATIONS
## AND HISTORY OF THE P320

24.     Sig designs and manufactures firearms for sale to law enforcement, military and commercial markets throughout the United States and internationally and markets and sells its products directly and through dealers.

25.     Sig was formerly known as SIG SAUERARMS Inc. and changed its name to Sig Sauer, Inc. in October 2007.  Its Chief Executive Officer at all times relevant to this Complaint was Ron J. Cohen.

26.     Upon information and belief, the owner of Sig in the United States is the L&O Holding Group.  The latter is owned by Michael Lüke and Thomas Ortmeier, who upon information and belief reside in Germany.

27.     The Sig P320 is susceptible to unintended discharges, meaning it can fire without user intent and a full trigger pull, at an alarmingly high rate.

28.     There have been over 200 known incidents (and likely many, many more) of Sig P320s unintentionally discharging.  Many of these unintended discharges have caused severe injury to the users and/or bystanders.

29.     Most of these users are law enforcement officers, former military personnel, and/or highly trained and practiced gun owners.

30.     At all relevant times, Defendants were acting by and through their employees, servants, and agents, acting within the course and scope of their employment, service and agency.

31.     In its "Safety Without Compromise" marketing materials for the P320, Sig promises:

# SAFETY WITHOUT COMPROMISE

We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.



## SAFETY WITHOUT COMPROMISE

We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

32.     Despite this express representation, which Sig has made for years, the weapon lacks industry-standard safety features and has fired unintentionally without an intentional trigger pull hundreds of times.

33.     Defendant Sig had knowledge long before the sales of the P320s used by plaintiffs that the P320 was capable of firing unintentionally due to defective components, inertial impulses, and the lack of necessary safety features, including a manual thumb safety, a tabbed trigger safety, an internal plunger safety, and a de-cocker.

34.     For almost a decade since the weapon was introduced to the market in 2014 and since Sig became aware of the risks of the P320's design, Sig wantonly failed to recall the P320, or issue an unambiguous safety warning about it, despite Sig's knowledge of scores of grievous wounds inflicted upon users and bystanders, as well as the company's knowledge that vibration as well as inertial impulses can make the gun fire without a trigger pull.

35.     Many U.S. law enforcement agencies, local police departments, military personnel (at a commander's discretion), and private owners routinely carry pistols with a chambered round.

36.     At all relevant times Sig knew many of its customers carry with a chambered round and that American law enforcement agencies as a rule carry with a chambered round.

37.      In fact, Sig advertises that users can carry the P320 with a round chambered by annotating the P320's capacity in various configurations such as "10 + 1," and "12 + 1."

38.     The "+ 1" represents a chambered round.

39.     The P320 is designed so that forcible rearward movement or "racking" of the slide places the striker under 100% spring tension, making it fully cocked and ready to fire.

40.     Pulling the trigger of the P320 merely drops the sear wall holding the striker foot in place; it does not further cock the striker spring.  The P320 is already fully spring charged once the slide is racked.

41.     This differs substantially from the design of other striker fired pistols, in which the striker is not under complete spring tension (as little as 60% in Glock pistols) and a trigger pull adds the remaining necessary spring tension to allow the striker to launch forward and hit the rear of a round.

42.     In the illustration below, the striker, in orange, is held back by the sear, in blue. Both are circled.  (Figure 1).  The lack of a tabbed trigger safety is also circled.

43.     As multiple CT scans of failed P320s have established, however, the actual interface between the striker foot and sear is shallower and more precarious than depicted.  (Figure 2).  The lack of a tabbed trigger safety is also circled:



Figure 1



Figure 2

44.    Sig assembled the P320 using a frame from an earlier hammer-fired Sig pistol, the

P250. Therefore, contrary to Sig's representations, the P320 was never built from "the ground up."

45.    While competing for a $580 million contract to supply the United States Army with

a new pistol in 2016, Sig's prototype P320 exhibited more than 200 malfunctions during testing.

The Department of Defense demanded that Sig fix all problems associated with the prototype and

include an external safety:

| ENGINEERING CHANGE PROPOSAL (ECP) | 1. DATE PREPARED (DD-MMM-YYYY) 10-MAY-2017 | 2. PROCURING ACTIVITY NO. (PAN): L17S5052 | OMB No. 0704-0188 |
|---|---|---|---|
| | | 3. ECP NUMBER: MHS-E-0005 | |

The public reporting burden for this collection of information is estimated to average 2 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to Department of Defense, Washington Headquarters Services, Executive Services Directorate, Information Management Division, 4800 Mark Center Drive, Alexandria,VA 22350-3100 (0704-0188). Respondents should be aware that notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information if it does not display a currently valid OMB control number. PLEASE DO NOT RETURN YOUR COMPLETED FORM TO THIS ADDRESS. RETURN COMPLETED FORM TO THE GOVERNMENT ISSUING CONTRACTING OFFICER FOR THE CONTRACT/PROCURING ACTIVITY NUMBER LISTED IN ITEM 2 OF THIS FORM.

**4. TITLE OF CHANGE:** XM17/XM18 LIGHTWEIGHT COMPONENTS

| 5. CLASS OF ECP: ☐ Major ☒ Minor ☐ Administrative | 6. PRIORITY: ☐ E - Emergency ☒ U - Urgent ☐ R - Routine | 7. ECP TYPE: ☒ P - Preliminary ☐ F - Formal |
|---|---|---|

**8. JUSTIFICATION CODE:** ☐ B - Interface ☐ C - Compatibility ☐ D - Correction of Deficiency ☐ L - Logistics Support ☒ O - Operational or Product Improvement ☐ P - Production Stoppage ☐ R - Cost Reduction ☐ S - Safety ☐ V - Value Engineering

**9. DESCRIPTION OF CHANGE:**
REPLACE EXISTING SEAR, STRIKER PIN AND TRIGGER WITH LIGHTWEIGHT VERSIONS OF SAME COMPONENTS

**10. NEED FOR CHANGE:**
PRODUCT IMPROVEMENT TO ENHANCE PERFORMANCE

| 11. MODEL/TYPE DESIGNATION: (e.g., M16) XM17/XM18 MHS | 12. SYSTEM/CONFIGURATION ITEM NOMENCLATURE: (e.g., Rifle) PISTOL | 13. AFFECTED ITEM NOMENCLATURE: (e.g., Bracket) FIRE CONTROL |
|---|---|---|

| 14.a. OTHER EXTERNAL SYSTEM AFFECTED? ☐ Yes ☒ No | 14.b. IF BLOCK 14.a. IS YES, LIST OTHER SYSTEMS OR CONFIGURATION ITEMS AFFECTED: |
|---|---|

| 15. ALL LOWER OR HIGHER ITEMS AFFECTED | a. NOMENCLATURE: | b. PART NO.: | c. NSN: |
|---|---|---|---|

**16. DOCUMENTS AFFECTED** (Continue on back if necessary)

| a. CAGE | b. DOCUMENT NO. | c. NOMENCLATURE | d. CURRENT REVISION | e. NOR NO. | f. REVISED DOCUMENT ATTACHED |
|---|---|---|---|---|---|
| 6ZWB1 | 1301837M17 | RECEIVERSUBASSY, M17 | 00 | 1 | |
| 6ZWB1 | 1301871M18 | RECEIVERSUBASSY, M18 | 00 | 1 | |
| 6ZWB1 | 1301858M17 | RECEIVERSUBASSY, GENERAL OFFICER | 00 | 1 | |
| 6ZWB1 | 1300927M17 | SEAR GROUP SUBASSY | 00 | 1 | |
| 6ZWB1 | 1302040M17 | TRIGGER, LW | 00 | 1 | |
| 6ZWB1 | 1301821M17 | SEAR, LW | 00 | 1 | |
| 6ZWB1 | 1300926M17 | STRIKER SUBASSY | 00 | 1 | |
| 6ZWB1 | 1301189M17 | PIN, STRIKER LW | 00 | 1 | |

| 17. BASELINE AFFECTED: ☐ Functional ☐ Allocated ☒ Product | 18. IN PRODUCTION? ☐ Yes ☒ No 5/19/2017 | 20. EFFECT ON DELIVERY SCHEDULE: NONE |
|---|---|---|

| 21.a. RECOMMEND RETROFIT TO EXISTING ASSETS? ☐ Yes ☒ No | b. IF BLOCK 21.a. IS YES, DESCRIBE RETROFIT REQUIREMENTS: | c. COST IMPACT FROM ECP? ☐ Yes ☒ No |
|---|---|---|
| | | d. IF 21.c. IS YES, DESCRIBE: |

| 19. EFFECTIVITY (Lot No., Serial No., Date): 5/19/2017 | | |
|---|---|---|

**22. CONTRACT** — a. CONTRACTOR: W15QKN-17-D-0016    b. CONTRACT NO./LINE ITEM: N/A

| 23. CONTRACTING OFFICER | a. NAME: VINCENT F TURCO | b. TELEPHONE: 973-724-2016 | c. E-MAIL: VINCENT.F.TURCO.CIV@MAIL.MIL |
|---|---|---|---|

| 24. ORIGINATOR | a. NAME (submitter): SEAN TONER | b. ADDRESS (Street, City, State, Zip Code:) 72 PEASE BOULEVARD, NEWINGTON, NH 03801 |
|---|---|---|
| e. ECP ORIGINATOR CAGE CODE: 6ZWB1 | c. TELEPHONE: 603.610.3353 | |
| | d. E-MAIL: SEAN.TONER@SIGSAUER.COM | |
| f. SUBMITTING ACTIVITY: | g. AUTHORIZED SIGNATURE: | h. NAME and TITLE (Authorizing Official): |

**25. BELOW TO BE COMPLETED BY THE APPROVING ACTIVITY**

| a. RECOMMENDATIONS: ☒ Approval ☐ Disapproval ☐ Approval with Modification | | | |
|---|---|---|---|
| b. NAME and TITLE: Kevin Caflin ARDEC Eng - Weapons/MHS | c. DATE SIGNED (DD-MMM-YYYY): 12-MAY-2017 | d. SIGNATURE: CAFLIN.KEVIN.W AYNE.1031625765 *(digital signature details)* | |

| 28.a DISPOSITION (Configuration Change Authority): ☒ Approval ☐ Disapproval ☐ Approval with Modification | | | |
|---|---|---|---|
| b. NAME and TITLE: Tom Vass PM IW Product Lead - MHS | c. DATE SIGNED (DD-MMM-YYYY): 13 May 2017 | d. SIGNATURE: VASS.THOMA S.1228885750 *(digital signature details)* | |

**27. TO BE COMPLETED BY THE ACTIVITY ACCOMPLISHING REVISION UPON NEW REVISION RELEASE**

| a. NAME and TITLE: | b. DATE NEW REVISION(S) RELEASED: | c. SIGNATURE: |
|---|---|---|

**DD FORM 1692, MAR 2013**   PREVIOUS EDITION IS OBSOLETE   Microsoft Office WORD 2007

DISTRIBUTION STATEMENT F: FURTHER DISSEMINATION ONLY AS DIRECTED BY PM-SW-IW, SFAE-SDR-SW-IW, PICATINNY ARSENAL, NJ

Encl 4

46.    The DOD only agreed to the purchase of the P320 after Sig committed to replacing several components and including an external manual thumb safety for every military gun sold.

47.    Upon information and belief, every striker-fired pistol on the market – except those sold by Sig – is under far less than 100% striker spring pressure and is equipped with some type of external safety.

48.    Since the P320's distribution into the stream of commerce, Sig has expressly represented that the weapon possessed a "robust safety system":



SAFETY WITHOUT COMPROMISE.

Safety isn't negotiable. The P320 maximizes peace of mind with a robust safety system. Never again will you need to pull the trigger to disassemble your pistol. And, while available as an option, you won't need a tabbed trigger safety for your gun to be drop safe.

49.     In fact, any single action, striker fired gun without a tabbed trigger or thumb safety is inherently unsafe and at major risk for drop fires and other discharges without a full trigger pull.

50.     Sig knew the latter fact as early as December 2013, as the company's own inhouse testing demonstrated.

51.     The purpose of a tabbed trigger safety is to prevent drop fires and to prevent discharge if the trigger is subjected to any pressure that is not a direct firing pull.

52.     Despite its manufacturing ability, Sig never included a tabbed trigger safety as a feature of the P320, saving approximately $5 per gun produced, or $12,500,000 in total given the number of P320s currently in circulation.

53.     Sig's original design and manufacture of the P320 rendered the weapon unreasonably dangerous for its intended uses and for any foreseeable uses, including normal carrying, holstering, un-holstering, and/or handling.

54.     One of the designers of the P320, Sean Toner, has testified that he does not carry his P320 with a round chambered despite knowing that American law enforcement carries with a chambered round at all times.

55.     When Sig shipped P320s to dealers for sale to law enforcement agencies and civilian consumers in 2014, it knew or should have known: a) that the weapon was defective in its design and unreasonably dangerous for its ordinary uses, intended uses, and other foreseeable uses; and b.) that un-commanded discharges could and would occur in the ordinary course of using the weapon.

56.     The injuries to Officers Currington and Gally, and harm caused to many others, was the foreseeable result not only of Sig's internal testing in December 2013, but its later failure modes

and effects criticality analysis ("FMECA") performed by Sig for both its internal use and the DOD's analysis in or around 2016.

57.    Upon information and belief, Sig has not disclosed the FMECA document in P320 discovery to date despite scores of requests for it in federal and state litigation around the country.

58.    The purpose of the FMECA was to assess the vulnerabilities of the P320 to certain health and safety risks associated with the use of the P320.

59.    The FMECA identified risks associated with the use of the P320 including discharges without a trigger pull of which Sig was already aware.  Upon information and belief, Sig concealed this document and withheld it in discovery in scores of cases going back to 2017.

60.    Indeed, to contain the spreading incidents and lethal risk of un-commanded discharges to end users, Sig filed a provisional patent application in October 2017 to add a "secondary sear notch" to the P320's sear in case the primary engagement failed to due to a mere "impulse" that "causes the striker to disengage from the first engagement surface," as noted in the Abstract:



US 20190107353A1

(19) **United States**
(12) **Patent Application Publication** (10) Pub. No.: **US 2019/0107353 A1**
Thomele et al. (43) Pub. Date: **Apr. 11, 2019**

(54) HANDGUN SEAR WITH MULTIPLE ENGAGEMENT SURFACES

(71) Applicant: SIG SAUER, INC., Newington, NH (US)

(72) Inventors: **Adrian Thomele**, Stratham, NH (US); **Sean P. Toner**, Merrimack, NH (US); **Albert Richard Larochelle**, Manchester, NH (US); **Keith Andrew Cornish**, Barrington, NH (US); **Mark Kimball**, Exeter, NH (US); **Andrew Phillip Loriot**, Somersworth, NH (US); **Matthew Thomas Barker**, Epping, NH (US); **Derek A. Oaks**, Manchester, NH (US); **Tyler Robert Thibodeau**, Chester, NH (US); **Joshua Robert Shoemaker**, Rochester, NH (US); **Erik Raymond Guillemette**, Durham, NH (US); **Michael D. Couture**, Rochester, NH (US); **Zachary Messier**, Somersworth, NH (US); **Jacob Thomas Shawley**, Somersworth, NH (US); **David Steimke**, Epping, NH (US)

(73) Assignee: SIG SAUER, INC., Newington, NH (US)

(21) Appl. No.: 16/156,266

(22) Filed: **Oct. 10, 2018**

Related U.S. Application Data

(60) Provisional application No. 62/570,623, filed on Oct. 10, 2017, provisional application No. 62/577,975, filed on Oct. 27, 2017.

Publication Classification

(51) Int. Cl.
  *F41A 19/32* (2006.01)
  *F41A 19/12* (2006.01)
(52) U.S. Cl.
  CPC .............. *F41A 19/32* (2013.01); *F41A 19/12* (2013.01)

(57)          ABSTRACT

A handgun sear has a sear body extending between a proximal end portion to a distal end portion. The sear defines a first engagement surface adjacent the proximal end portion and a second engagement surface positioned distally of the first engagement surface. The sear can pivot about the distal end portion between a cocked position and a displaced position. The second engagement surface can be used to arrest forward movement of the striker in the event of an impulse that causes the striker to disengage from the first engagement surface. The sear may be incorporated into a fire control assembly of a semiautomatic handgun or other firearm.



61.    Only months before, Sig had informed the public in a press release that "vibration," among other inertial impacts, could cause the P320 to catastrophically malfunction.

62.    While falsely claiming that this jarring language was "common" to other pistols' user manuals, it was not, and Sig management knew at this point that the P320 was extraordinarily dangerous because of its reckless design and manufacturing problems.

63.    Unable to be candid about the problem, however, Sig "reaffirmed the safety" in the same release, leaving law enforcement and the public completely reassured that the gun was safe:



**♦PR Contact:**
Jordan Hunter
SIG SAUER, Inc.
603-610-3293
jordan.hunter@sigsauer.com

FOR IMMEDIATE RELEASE

### SIG SAUER® Reaffirms Safety of P320® Pistol

*Striker-fired pistol exceeds safety standards of ANSI/SAAMI® and U.S. military testing*

**Newington, NH (August 4, 2017)** – In response to social media rumors questioning the safety of the P320 pistol, a variant of which was selected by the U.S. government as the U.S. Army's Modular Handgun System (MHS), SIG SAUER, Inc. has full confidence in the reliability, durability and safety of its striker-fired handgun platform. There have been zero (0) reported drop-related P320 incidents in the U.S. commercial market, with hundreds of thousands of guns delivered to date.

The P320 meets and exceeds all U.S. standards for safety, including the American National Standards Institute (ANSI) and Sporting Arms and Ammunition Manufacturers' Institute, Inc. (SAAMI), as well as rigorous testing protocols for global military and law enforcement agencies.

All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to not work as designed. This language is common to owner's manuals of major handgun manufacturers.

As a result, individual attempts to perform drop tests outside of professionally controlled environments should not be attempted.

"SIG SAUER is committed to producing only the finest products," said Ron Cohen, President and CEO of SIG SAUER. "Safety and reliability have been and always will be paramount to the SIG SAUER brand."

For more information on SIG SAUER, please visit us at sigsauer.com

Follow SIG SAUER on social media, including Facebook at facebook.com/sigsauerinc, Instagram at instagram.com/sigsauerinc, and YouTube at youtube.com/user/sigsauerinc.

**SIG SAUER, Inc.**

SIG SAUER, Inc. is The Complete Systems Provider™, leading the industry in American innovation, ingenuity, and manufacturing. SIG SAUER® brings a dedication to superior quality, ultimate reliability, and unmatched performance that has made it the brand of choice among many of the world's elite military, government and law enforcement units as well as responsible citizens. SIG SAUER offers a full array of products to meet any mission parameter, including handguns, rifles, ammunition, electro-optics, suppressors, ASP (Advanced Sport Pellet) airguns and training. The largest member of a worldwide business group of firearms manufacturers that includes SIG SAUER GmbH & Co. KG in Germany and Swiss Arms AG in

64.    Despite having knowledge of the P320's severe defects, Sig did not adequately warn the public about the dangers of the P320 or issue a mandatory recall, as it had done for other of its products that contained defects.

65.    On September 15, 2017, for example, Sig issued an unambiguous "safety warning" and mandatory recall of "a limited number of SIG SAUER rifles" due to an "improperly heat-treated hammer" that "over time could result in a trigger malfunction creating a significant safety hazard":



# SIG SAUER Safety Warning and Recall Notice

**A Limited Number of SIG SAUER Rifles**

Newington, NH [September 15th, 2017] - SIG SAUER, Inc. has determined that a limited number of rifles in the SIG716 DMR®, SIG516® Carbon Fiber and SIGM400® Predator models were built with a two-stage SIG SAUER trigger that may have an improperly heat-treated hammer. Over time this could result in a trigger malfunction creating a significant safety hazard. SIG SAUER is issuing a mandatory recall to replace the hammer and trigger assembly in these specific rifles. This recall does not affect any military or law enforcement rifles or any SIG MCX®/SIG MPX® products.

SIG SAUER will correct any of the affected firearms at no cost to the customer.

66.    Again, on November 25, 2020, Sig issued an unambiguous "safety recall notice" for its CROSS bolt-action rifles, advising owners to "immediately discontinue use of the rifle" because of the risk of delayed discharges after a trigger pull.



**NEWINGTON, N.H.,** (November 25, 2020) – Today Sig Sauer, Inc. is announcing a safety recall for the CROSS Bolt-Action Rifle, and consumers should immediately discontinue use of the rifle. This recall applies to all CROSS Bolt-Action rifles currently manufactured.

Sig Sauer has viewed an online video that presents a single CROSS Bolt-Action Rifle with a potential safety concern. This gun has been returned to Sig Sauer and upon evaluation it has been confirmed that the rifle exhibited a delayed discharge after the trigger was pulled. Sig Sauer has decided to issue a safety recall in order to implement a modification to the firing action to address this potential safety concern.

67.    Yet at no time did Sig issue a safety warning for the Sig P320 or recall notice. Instead, it announced a "voluntary upgrade program" for the pistol while stating, at the same time, that it was safe in its "current configuration."

68.    Sig, in short, dissembled and deceived end users that their P320s were safe as is and, at the same time, tried to erect a legal defense to claims by announcing the ambiguously worded "voluntary upgrade program" in August 2017.

69.    The latter was presented as not urgent, optional, performance-related, and in fact unnecessary.  It did not adequately warn any reasonable person of the serious safety risks associated with the product of which Sig was fully aware by that time.

70.    Sig failed to issue a safety warning and recall notice for the P320 because Sig had just been awarded the prestigious $580 million contract with the Department of Defense in January 2017 to make the P320 the standard pistol for U.S. Armed forces, defeating Glock in the process. A recall and safety notice in view of those facts would have jeopardized that contract and presented a public relations and marketing disaster for the company.

71.    Law enforcement and civilian users were therefore left twisting in the wind, at daily risk of harm including death from the P320.

72.    Undersigned counsel for plaintiffs has filed numerous lawsuits identifying many of the Sig P320 unintended discharge incidents from 2014 to the present.

73.    Documents produced by Sig and obtained directly from victims and law enforcement agencies establish that Sig knew of at least **107** other incidents and injuries caused by the P320 before Officers Currington and Gally were shot and nearly killed in 2024.

74.    Through discovery in prior cases, Sig produced information related to numerous similar incidents.  The documents came in a variety of different forms, including Sig incident reports, images of incident notes from Sig's Oracle system[3], police incident reports, emails from individuals involved in the incidents, inspection reports and civil complaints.  Several of these

---

[3] Sig's corporate designee on the issue of other similar incidents, Chrisopher Meyer, testified that Sig uses a system called "Oracle" to track incidents of unintended discharges.

incidents, evidencing the defective nature of the P320 and Sig's knowledge and prior notice of the

issue, are described below.[4]

1. Michael Richardson (February 4, 2016) – Roscommon, Michigan, sheriff's deputy whose P320 discharged as he was exiting his patrol vehicle. The incident was captured on Deputy Richardson's bodycam, which is described in greater detail below. Sig Sauer produced a police incident report and two affidavits related to this incident. (SIG OAI 00001-000013). An excerpt of a report is provided below.

```
Page  1 of 2            ROSCOMMON COUNTY SHERIFF DEPT.    Report 16-0000373
                              Incident Report             Date   02/04/16
                          PO BOX 206, 111 SO. 2ND ST.     Time   6:10 PM
Phone:(989)275-5101          ROSCOMMON MI 48653

Narrative:

INFORMATION:
     U/S Officer was handling a vehicle in the ditch on N/B 127 south of the
201 mile marker.  As I exited the patrol vehicle my weapon discharged while
being completely in the Holster.  The round went through the driver's seat,
and exited through the bottom of the floor pan.

OFFICER'S INJURIES:
     Officer received a red welt on my upper left thigh from either the
muzzle blast, holster coming apart or both.

OFFICER'S ACTIONS:
     Officer, along with Witness checked Officer for injury.  Officer
removed the magazine from the weapon, cleared the weapon, removing the empty
shell casing from the chamber of the weapon and placed all three on the
passenger side floorboard of the patrol vehicle.  Officer advised Sgt Maeder
of the incident, returned to the office and turned over the weapon,
magazine, and shell casing to Lt Tatrai.
```

(SIG OAI 00002).

2. Unnamed Police Officer (July 1, 2016) – Surprise, Arizona, police officer whose fully holstered P320 discharged as he was exiting his vehicle. Sig Sauer produced a Word document incident report related to this incident. (SIG OAI 000014-000017). An excerpt is copied below.

---

[4] At Sig Sauer's request, the parties entered into a Stipulated Protective Order in this litigation deeming certain documents as confidential. The parties agreed that such documents will not be filed with the Court except under seal. Images contained below were not confidential. Plaintiff will bring a copy of the confidential OSI documents to Court to allow the Court to review these at a Motion in Limine hearing or at any time before at the Court's request.

> **Date:  July 1, 2016**
>
> **Location:  Surprise, AZ**
>
> **Incident:  On or around July 1, 2016, a Surprise, AZ Police Officer's P320 pistol allegedly discharged as he was exiting his vehicle.  The officer was left-handed with his pistol holstered on his left-hip.  An inspection of the pistol showed marks consistent with contact with a seat belt buckle.  The subject holster had a large opening at the trigger guard location which could allow a seat belt to enter the trigger area and allow a trigger pull.  Additionally, the holster had gouging consistent with a seat belt buckle getting into the holster in the trigger guard area.  An investigation by the Surprise, AZ Police Department confirmed that the discharge was caused by the seatbelt buckle getting into the trigger area and pulling the trigger.**

(SIG OAI 000014).

3. Thomas Frankenberry (October 11, 2016) – Myrtle Beach, South Carolina, resident and retired New York Police Department officer who was shot when his fully holstered P320 discharged in a restaurant.  Sig produced a civil complaint which was filed September 16, 2019, related to this incident.  (SIG OAI 00018-00034).

4. Cody Hoefs (November 23, 2016) – Tacoma, Washington, resident who was shot by his P320 as he was holstering it into a Sig holster.  Sig produced a civil complaint which was filed February 26, 2020, related to this incident.  (SIG OAI 00035-00078).

5. Kevin Powers (November 19, 2016) – Holmes Beach, Florida, police officer who suffered career ending injuries when his P320 discharged while he was in the process of clearing it.  Sergeant Powers swore under oath that he did not pull the trigger of the firearm.  Sig produced the civil complaint filed June 3, 2020, and police reports for this case.  (SIG OAI 00079-00182).

6. Anoka County Deputy (January 4, 2017) – Sig produced an email to a Sig Regional Manager for law enforcement sales.  The email memorialized information received from Jeff Barrett at the Anoka Sheriff's Department in Minnesota.  There, a deputy was carrying his P320 in the holster that was provided with the gun.  He attempted to remove the holstered P320 off his belt, and the gun discharged into his leg.  He reported that his hand was over the holster and that he does not believe he touched the trigger.  Residue inside the holster indicated that the muzzle was in the holster at the time of discharge.  (SIG OAI 002052-002954).  An excerpt of the email is copied below.

I met him today at 4:00 PM at his house. He told me that he had just received the gun as a gift for Christmas. The gun had been purchased by his wife at Cabellas and had never been fired. He told me that he was carrying the gun in the Sig holster provided with the gun. He said when he was standing in his kitchen, he was attempting to take the gun and holster off of his waist/belt when it discharged. He said he did know what happened and thought his wife dropped something. His wife asked him if he shot himself and that's when he noticed that the gun fired and he was hit in the leg. He said he had his hand over the holster and was taking it off of his belt and doesn't believe he touched the trigger.

He said he is familiar with Striker fire pistols and carries a Glock as a duty weapon. He told me that he noticed that there was residue from the gun being fired inside of the holster, indicating that the muzzle was inside of the holster. After the gun was fired, it landed on the floor separate from the holster. I showed him the safety features of the P320 and we couldn't figure out how the gun could have fired. He agreed that I could send the gun to the factory to be examined. I have and will sent the pistol, magazine and holster. I do not have the case. Val sent me an RMA and I will send it back for him. He was very cooperative and appeared the knowledgeable about guns.

(SIG OAI 002052-53)

7. David O'Conner (May 10, 2017). Sig produced notes from its "Oracle" intake system related to a discharge in Riverdale, Georgia, where an officer tripped and fell on his gun side, causing his holstered P320 to discharge. The weapon stove-piped, further confirming that the gun discharged from within the holster.



SIG OAI-00184, "Oracle" notes related to the Riverdale discharge

8. Michael Stanziola (February 4, 2018) - Hazleton, Pennsylvania, resident who was shot when his P320 discharged as he was attempting to place the pistol in his holster. Sig produced an internal word document incident report related to this incident. (SIG OAI 00208; This document is marked as confidential and can be produced to the court as a hard copy).

9. Marcie Vadnais (February 17, 2018) –Loudoun County, Virginia, sheriff's deputy who was shot when she was removing her fully holstered P320 from her duty belt. Sig produced a civil complaint, forensic documents, correspondence between the Loudoun County Sheriff's Department and Sig, and expert reports, among other documents, related to this incident. The narrative of the letter sent by the Loudoun County Sherrif's Office to Sig on March 30, 2018 is copied below. This letter was produced by Sig, bate stamped SIG-OSI-209 and demonstrates that Sig was aware of this incident long before Plaintiff's purchase and discharge.



Sheriff Michael L. Chapman

# LOUDOUN COUNTY SHERIFF'S OFFICE

P.O. Box 7200, Leesburg, Virginia 20177-7200
803 Sycolin Road SE, Leesburg, Virginia 20175
Telephone  703-777-0407

March 30, 2018

SIG SAUER, Inc.
72 Pease Boulevard
Newington, NH 03801

To Whom it May Concern:

Please accept this letter as an official request for SIG SAUER, Inc. to provide information necessary to an internal affairs investigation I am conducting for the Loudoun County Sheriff's Office. On February 7, 2018, a Loudoun County Deputy Sheriff sustained a non-life threatening gunshot wound to the upper right thigh while seated in a patrol vehicle. The deputy reported that the issued firearm, the full-size SIG SAUER P320, was in the SIG SAUER P250 holster at the time it discharged. Further, the deputy reported he/she was manipulating the holster in an attempt to remove it from the trousers belt and his/her hands were on the outside of the holster, and not on the handgun, at the time the weapon discharged. The deputy further reports that he/she was wearing a sweatshirt and jacket at the time.

(SIG OAI 00209)

10. Jamie O'Ryan (March 27, 2018) – Wallingford, Connecticut, resident whose P320 discharged as he was racking his slide to chamber a round.  Sig produced an internal word document incident report and Oracle notes.  Sig was aware of this incident by April 19, 2018.  SIG-OSI-399; SIG-OAI-00400, SIG-OAI-00401

11. Zachary Sandoval (March 30, 2018) – Wellington, Colorado, resident whose P320 discharged while he was cleaning it.  He was certain his fingers never touched the trigger.  Sig produced a demand letter from Mr. Sandoval's attorney dated March 11, 2020, which demonstrates Sig was aware of this incident before the incidents giving rise to the instant action.

12. Gunter Walker (precise date unclear, appears to be in May, 2018) – Alabama resident whose holstered P320 discharged when he placed it on his bedside table.  Sig produced emails from Mr. Walker and Oracle notes related to this incident. SIG-OAI-00409.  Sig became aware of this incident on May 7, 2018 when Mr. Walker directly emailed Sig.  SIG-OAI-00406.  This email is marked "confidential" by SIG and can be produced to the court as a hard copy.

13. Unnamed Rancho Cucamonga Texas Sheriff's Deputy (May 18, 2018) – Rancho Cucamonga, Texas, sheriff's deputy was seriously injured when his holstered P320

discharged, seemingly after making contact with his keys. Sig produced an email from the sheriff's office as well as an internal investigation report demonstrating that Sig was aware of this incident as of June 21, 2018. SIG-OAI-00411. The email dated June 21, 2018 is depicted below.

<div style="border:1px solid black; padding:1em;">

### The following pistol was sent to the factory for Evaluation for Unintentional Discharge P320-9-BSS-TACOPS. This pistol is not upgraded Serial #58B109270

**From:** Janowicz, Joseph [jjanowicz@sbcsd.org]
**Sent:** Thursday, June 21, 2018 12:32 PM
**To:** Tony Levatino
**Subject:** Sig Sauer P320

Good afternoon Tony,

On Friday, May 18, 2018, a Deputy from Rancho Cucamonga Sheriff's Station was seriously injured when his Sig Sauer P320 discharged while in his duty holster. The Deputy had completed his shift and walked to the locker room. He was in full uniform with his personally-owned Sig Sauer P320 duty pistol secured in his duty holster. The firearm discharged while in the holster and the bullet struck the Deputy's leg.

The investigation is on-going, but it appears the Deputy had a bag slung on his shoulder (gun side) as he walked into the locker room. Clipped to the outside of the bag was a set of keys. Based on preliminary information, it is suspected the key(s) may have slipped between the gun and the holster, catching the trigger as the Deputy walked. Due to the seriousness of the Deputy's injuries, and in the interest of thoroughness of our investigation, the Department requests a manufacturer's inspection of the firearm to rule-out any potential mechanical failures.

</div>

(SIG OAI 00411).

14. Paul Lorring (June 7, 2018) – Reno, Nevada, Court Officer whose P320 discharged as he was practicing drawing his weapon in the courthouse. Sig produced an internal word document incident report and Oracle notes related to this incident, which provide that Sig replaced the pistol with a Sig 226 double-action pistol. The Oracle notes prove Sig was aware of this incident as of June 13, 2018. (SIG-OAI-00414-00415). These documents are marked "confidential" by SIG and can be produced to the court as a hard copy.

15. John Mascaro (September 12, 2018) – Kingston, New Hampshire, resident was injured when his P320 discharged without him pulling the trigger. Sig only provided a demand letter from the victim's attorney, without any additional details related to the incident.

16. Shannon Hayes (October 13, 2018) – Riverdale, Georgia, police officer who was shot by his P320 was he was holstering it. Sig produced a police incident report and civil complaint

related to this incident.   (SIG OAI 000419-000455)   These documents are marked "confidential" by SIG and can be produced to the court as a hard copy.

17. Stephen Mayes (October 30, 2018) – Franklin County, Kentucky, resident who was also a competitive shooter and former law enforcement officer was shot by a fully holstered P320 while his hands were off of the firearm.  Sig produced a civil complaint related to this incident.(SIG OAI 00456-00472).

18. Michael Berkoff (precise date unclear, believed to be November 5, 2018) – was  shot in the hand and claimed the gun went off without him pulling the trigger.  Sig produced "Oracle" notes related to this incident demonstrating they were aware of the incident on November 5, 2018.  (SIG-OAI-00473 to 00477).  These documents are marked "confidential" by SIG and can be produced to the court as a hard copy.

19. Robert Bryan Lang (December 11, 2018) – Fulton County, Georgia, resident who was shot by his holstered P320 as he was attempting to remove his holstered P320 from his belt. This United States District Court for the Northern District of Georgia case (Case No. 1:21-cv-04196-ELR) concluded with a jury finding that the P320 was defective, Sig was negligent and Sig failed to warn its users of its defect, and each of these was a cause of the harm caused to Mr. Lang.

20. David Duff (December 11, 2018) – Pasco County, Florida, sheriff's deputy who was shot by his holstered P320 while in the process of putting on his duty belt.  Mr. Duff maintained that he never touched the gun, never removed it from his holster, and did not hit his duty belt on anything at the time of discharge.   The casing did not eject. Mr. Duff was cleared of any wrongdoing following an investigation by the Pasco County Sheriff's Office.  Sig produced the Pasco County Sheriff's investigative file.  (SIG OAI 01472-01574).  These documents are marked "confidential" by SIG and can be produced to the court as a hard copy.

21. Justin Schneider (December 22, 2018) – Rocky Ford, Kentucky, resident who handed his P320 to his wife, and it discharged during the exchange, striking her in the neck.  (SIG OAI 00490-01171).

22. Unnamed Walkerton, Indiana, Police Officer (January 11, 2019) – Officer's holstered weapon discharged as he was exiting his vehicle, with the weapon in a Level 3 retention holster with the strap up.  Sig produced inspection notes, emails, and Oracle notes related to the incident.  (SIG OAI 002055-002065).  The email from Walkerton Assistant Chief Charles Kulp to Sig employee Thomas Mechling is depicted below.

> On Jan 13, 2019, at 11:53, "ckulp@walkerton.org" <ckulp@walkerton.org>
> wrote:
>
>> Thomas,
>> Friday night I had an officer climbing out of the passenger side of
>> a 2017 Dodge Charger. As he was climbing out of the car the butt
>> of his gun hit the A pillar of the car. The weapon discharged,
>> narrowly missing his leg and blowing a hole in the floorboard of
>> the police car. The officer driving the car looked over as it
>> happened and stated that the officers hand was nowhere near the
>> firearm at the time of the discharge. The firearm was in a level 3
>> retention Safariland holster. The firearm was unable to cycle due to
>> the strap being up and shell casing was still in the weapon. I'm told
>> he was wearing nothing with any form of hanging straps or
>>
>> anything down into the holster that could have activated the
>> trigger. I'm on my days off and I'm emailing you from my phone.
>> I'll attach a few files for your review, however these are not high
>> definition files. Any guidance for me?
>>
>>
>> Asst. Chief Charles Kulp
>> Walkerton Police Dept.

(SIG OAI 002056-2057).

23. Brandon Watson (March 30, 2019) – Tarrant County, Texas, sheriff's deputy who was shot
after his P320 discharged while he was unholstering it.  Mr. Watson claimed he did not
touch the trigger and that something must have caught the trigger.  Sig produced a civil
complaint and the sheriff's department report related to this incident.  (SIG OAI 001172-
001211).  These documents are marked "confidential" by SIG and can be produced to the
court as a hard copy.

24. Sergeant J. Bocquet (March 13, 2019) – Bayou Vista Police officer experienced an
unintended discharge as he removed the holstered P320.  Sig produced emails and Oracle
notes which indicated that "[a]s [Sgt. Bocquet] was removing the holstered weapon from
his side to place it in the gun box the weapon fired."  Chief Jimmie Gillane viewed the
video from the Sheriff's Office and could "plainly see Sgt. Bocquet's finger is indexed
along the outside of the holster."  (Sig OAI 002066-2072).



(SIG OAI 2070).

25. Jonathan Cross (April 30, 2019) – Pasco County, Florida, school resource officer who was shot while he was practicing holstering and re-holstering his P320. Sig produced an internal word document incident report related to this incident. (SIG OAI 001219).

26. Thomas Ahern (May 19, 2019) – Cambridge, Massachusetts, SWAT member whose P320 discharged while he was performing a function check of the weapon. At the time of the discharge, Officer Ahern's right index finger was along the frame of his weapon, and he

did not have his finger on the trigger of the gun.  Sig produced a civil complaint related to this incident.  (SIG OAI 01220-01279).

27. Jack Williams (May 25, 2019) – New Bern, North Carolina, resident who was shot while on his motorcycle when his holstered P320 in his back pocket discharged.  Sig produced a civil complaint related to this incident.  (SIG OAI 01278).

28. Grant Fujimoto (July, 2019) – User whose firearm discharged while holstering.  He reported that he did not touch the trigger.  Sig produced Oracle notes.  (SIG OAI 02073-02076).

29. Walter Collette (July 23, 2019) – Somerville, Massachusetts, police officer whose pistol discharged while it was wrapped in a towel in his backpack or gym bag.  Sig produced an internal Word document incident report with minimal details related to this incident.  (SIG OAI 0001280).  These documents are marked "confidential" by SIG and can be produced to the court as a hard copy.

30. Jimmy Jinn (July 24, 2019) – New York, New York-based ICE agent who was shot when his P320 discharged while he was conducting qualification exercised.  Jinn placed his hand on his pistol's grip while it was still holstered, and the pistol discharged.  Sig produced a civil complaint related to this incident.  (SIG OAI 001281-001310).

31. Craig Jacklyn (August 26, 2019) – Southeastern Pennsylvania Transportation Authority (SEPTA) police officer whose P320 discharged from within his holster while he was riding a golf cart through a police station.  The incident was investigated, and Officer Jacklyn was cleared of any wrongdoing.  In response to this incident, the SEPTA police replaced all of the P320s in its arsenal with safer Glock pistols.  Sig produced the SEPTA police and Philadelphia District Attorney's office investigative file related to this incident.  (SIG OAI 001311-001391).  These documents are marked "confidential" by SIG and can be produced to the court as a hard copy.

32. Jacques Derosiers, (October 10, 2019) – Cambridge Police Officer's P320 discharged as he was exiting his vehicle.  Sig only produced a brief word document incident report related to this incident.  (SIG OAI 001392).

33. Frank Kneski (October 11, 2019) – East Orange, New Jersey-based Department of Veterans Affairs police officer was attempting to withdraw his pistol from his holster when the weapon discharged, causing burn injuries.  Sig produced a demand letter from Mr. Kneski's attorney to Sig, an email exchange between a Department of Veterans' Affairs armorer and Sig, and a video of the incident.  (SIG OAI 001396-1402).

34. David Albert (December 2, 2019) – Cambridge, Massachusetts, police officer whose P320 discharged when he hung the pistol on a bathroom stall hook.  Sig produced a Word document incident report related to this incident.  (SIG OAI 001422).  These documents are marked "confidential" by SIG and can be produced to the court as a hard copy.

35. Unknown Oklahoma Highway Patrol Officer (date unknown) – Oklahoma Highway Patrol Officer's holstered P320 discharged, allegedly after a foreign object entered the holster. An inspection by Sig revealed scratches on the side of the trigger, which Sig implies caused the incident. Contact with the scratched side area of this trigger would not have caused a discharge if a tabbed trigger was used. (SIG OAI 001404).



Inspected pistol and found that it appears a foreign object entered the holster causing the pistol to discharge. There are a lot of scratches and gouges on the right side grip module running from the trigger guard to the beaver tail. There is a scratch on top of slide. See Pictures Below

**SIG-OAI 01404, unilateral inspection report from Oklahoma Highway Patrol incident**

36. Ryan Nolan (November 2019) –Mr. Nolan's P320 discharged as he was deactivating a flashlight mounted to his P320. Sig only produced "Oracle" notes related to this incident.

(SIG OAI 001405-1407).  These documents are marked "confidential" by SIG and can be produced to the court as a hard copy.

37. Matthew Gardette (date unknown, likely Fall 2020) – Manteca, California, police officer whose fully holstered P320 discharged as he was putting on his gun belt.  Sig produced "Oracle notes," correspondence between Sig and the Manteca Police Department, photographs, and results of Sig's unilateral inspection of the subject pistol, and a witness statement from a fellow officer.  (SIG OAI 001408-1421).

During our conversation, I noted Ofc. Gardette was wearing his patrol pants and patrol shirt with no LBV on yet. Ofc. Gardette reached into his locker with his right hand and I watched him pull his duty belt out from within his locker while gripping it by the right buckle. As I saw Ofc. Gardette holding his duty belt, I could see he was single handedly gripping his duty belt by the right side buckle. I watched Ofc. Gardette swing his belt around the right side of his body with his right hand while gripping the buckle in efforts of wrapping it around his waist, when suddenly his firearm discharged. Ofc. Gardette's left hand was free and he had not gripped anywhere around the holster.

Ofc. Gardette immediately dropped his belt on the floor after the discharge. After ensuring no one was injured, I picked the belt up to inspect it and noticed there was a hole in the end of the holster as a result of the discharge, but I did not see any other blockage or damage surrounding the holster that would be reason for it discharging.

I handed the belt to Sgt. Casquiero, who arrived only a few seconds after the discharge. Ofc. Ryan Smith was also in the locker room during the time of the incident.

It should be noted, I was only a couple feet away from Ofc. Gardette when this occurred. Normally, I would not believe the firearm discharged without the trigger being pulled. However, I can say I personally witnessed the entire incident from start to finish and I did not observe any negligence or actions by Ofc. Gardette that would have caused for the firearm to have suddenly discharged.

Respectfully,

Primitivo Cruz
Police Detective
Manteca Police Department

1001 W. CENTER ST.    MANTECA, CA 95337    (209) 456-8210    FAX (209) 923-8938
WWW.CI.MANTECA.CA.US

**Letter from eyewitness to Gardette incident, produced without a Bates label**

38. Unnamed Fulton County Ohio Sheriff's Deputy (January 2, 2020) – Fulton County, Ohio, sheriff's deputy whose holstered P320 discharged while training with a K-9.  Sig performed a unilateral inspection of the pistol and holster and found that the holster could be bent into the trigger housing, pressing against the trigger and causing it to move rearward.  Sig Sauer produced emails between the office and Sig, "Oracle" notes, and a Sig unilateral inspection report.  (SIG OAI 1423-001432).

> The pistol was returned with an Uncle Mike's Sidekick Holster size 15. This holster is well worn, and does not properly fit the pistol, leaving the trigger exposed and accessible. Additionally, a crease was observed molded into the holster at and around the trigger and trigger guard area. When the holster is flexed this crease bends into the trigger housing. During simulated testing this crease was able to be manipulated to press against the trigger and move the trigger rearward.

**SIG OAI-01431, unilateral inspection report of Fulton County gun**

(Image of Oracle Note - SIG OAI 02077).

39. Kyle Guay (January 28, 2020) – New Hampshire resident whose P320 discharged from within his holster while walking his dog.  Sig produced a civil complaint related to this incident.  This matter led to litigation in which the Court concluded that Mr. Guay's P320 did discharge without him pulling the trigger.  (D.NH 1:20-CV-007365-AJ).



40. Tanner Larson (January, 2020) – accidental discharge involving a P320 in a Sig -provided holster.  The notes produced by Sig state "more information and pictures will be provided."  No additional notes were provided beyond the Oracle notes.  (SIG OAI 02077).

41. Matthew Levine (March 25, 2020) – Maine resident who was shot by his P320 while he was attempting to holster it. Mr. Levine told police he did not have his finger on the trigger at the time of discharge. Sig produced the police report related to this incident. (SIG OAI 001684-001687). These documents are marked "confidential" by SIG and can be produced to the court as a hard copy.

42. Chris Campbell (May 20, 2020) – Missouri resident who was shot when he was walking with his P320 fully holstered. Sig produced a civil complaint and photographs of Mr. Campbell's injuries. (SIG OAI 001688-001707).

43. Unnamed Elkhart, Indiana, Police Officer (May 21, 2020) – Elkhart, Indiana police officer whose P320 discharged while in a small satchel with several other items. Sig produced an email from the Elkhart, Indiana police department to Sig and Sig's unilateral inspection report which concluded that an object entered the holster. (SIG OAI 001708-001717).

44. Officer Cushman (first name not listed) (June 2, 2020) – Union City, California, police officer whose P320 discharged while fully holstered, within his duty belt, while the belt was hanging inside of his locker from its designated hook. Sig produced email correspondence between Sig and the Union City, California, police department about the incident, and a report from Sig's unilateral inspection of the subject pistol. (SIG OAI 001720-001721). These documents are marked "confidential" by SIG and can be produced to the court as a hard copy.

45. Blake Thomas (June 8, 2020) – Birmingham, Alabama, resident who experienced an unintended discharge of his P320 when it fired after he placed the P320 in the Sig Sauer holster as he was leaning over into his car. Mr. Thomas is certain his finger was not on the trigger. Sig Sauer produced emails with Mr. Thomas and photographs. (SIG OAI 002095-002102). The email report from Mr. Thomas is copied below.

---

**From:** Blake Thomas <bthomas@southpace.com>
**Sent:** Monday, June 8, 2020 4:31 PM
**To:** Ryan Dome <Ryan.Dome@sigsauer.com>
**Subject:** Re: SIG SAUER

Ryan,

I am in real estate. I was going inside a property with my demolition guy who was inspecting a property I recently purchased. We knew the property had a history of "housing" people on drugs and many homeless folk. I thought someone was in the house when I arrived so I wanted to make sure my gun was on my side. I got out of the car and pulled out my gun from underneath the seat. I pulled the slide back to confirm that there was a bullet in the chamber. I confirmed the gun was loaded with a bullet in the chamber. When I slid the gun into the plastic SIG case/holster, the gun fired. At the time the gun misfired, I was holding the handle and made sure my finger was not on the trigger. The gun fired while I was leaning over into my car. The gun shot through my seat and my car keys that were lying on the seat and the bullet is still lodged somewhere in my car. I have attached a few pictures. My ears were ringing for days and I am fortunate I was not sitting down or else I probably would've been shot. There were hollow points in the gun at the time so getting shot short range with hollow points would've been devastating. I consider myself lucky to be alive.

Let me know if you have any other questions.

---

(SIG OAI 002095-002102).

46. Adam Maritato (July 14, 2020) – Milwaukee, Wisconsin, police officer who was shot by his partner's holstered P320 while his partner bent over to inspect a vehicle. Sig produced the Milwaukee police department file.

47. Josh Cantu (April 4, 2021) – Laredo, Texas, police officer whose holstered P320 discharged while the officer was indoors and watching footage of a crime. Sig produced an incident report which provided that this was the *third* incident of a Laredo, Texas, police officer's firearm going off without the officer touching the pistol. The pertinent section of the incident report is below:

---

**Circumstances Surrounding the UD (In uniform or plain clothes – Effecting an arrest, if so was there a struggle – Sitting in a vehicle affixing a seatbelt – Etc.)** Below is an email that I received from David Casarez after our initial phone conversation. This email is cut and pasted in its entirety:

On April 4th approximately 2am. One of the officers duty firearm (Sig P320) discharged inside his holster. The officer was kneeling, watching video camera footage of a burglary that had just occurred. He stated that as he was getting up, the firearm discharged inside his holster, his

---

hands were In front of his body and never by the firearm.  Prior to that incident he and two officers had cleared the residence so their body camera was on.  The incident was caught on video from one of the officer body camera.

I spoke to our Chief of Police today who reviewed the video and confirmed that the video show's the gun discharging inside the holster on its own. He did mentioned that it appeared the officers forearm might have touch the holster when it went off. The firearm did not cycle and was not removed from the holster.  A CSI arrived to recovered the holster and firearm.  The firearm was never removed the from the holster.   The firearm and holster were sent to Bexar County lab this morning and I believe the firearm was removed from the holster.  There was no foreign object inside the holster. It appears the firearm just fired on its own.

This is the 3rd time a Sig P320 discharges inside a holster within our department.  All officers have claimed their hands never touched the firearm when it was off.

(SIG-OAI-01861, Sig Sauer internal incident report).

   75. This latter list of OSIs, which are based on Sig's own documents, demonstrates that for years before Plaintiffs were shot by their P320s in May and September 2024, Sig was aware of a long list of unintended discharges where users reported that they did not intentionally pull the trigger, including  numerous additional victims in a case filed in this District on November 30, 2022, No. 22-536 - *Armendariz et al v. Sig Sauer, Inc*.  P320 victims in that case include: Fernando Armendariz, Nicola Bevacqua, Jada Bray, Matthew Breedon, Zachary Brown, Anthony Buck, Angela Marie Campbell, Christopher Campbell, William Campbell, Catherine Chargualaf, Juan San Nicholas Chargualaf, William Clegg, Erin Cooper, Keri Dawn Cuasito, Wendell Cuasito, Johnny Davis, Diana Delgado, Dionicio Delgado, Joseph Doffeny, Mary Doffeny, David Duff, Juan Duran, Russell Dykema, Clayton Ellis, Kyla Ellis, Christina Fahlbush, Christopher Fahlbush, Stephen Fernandez, James Garth, Jr., Rodney Gaston, Joseph Halase, Lynn Marie Halase, Cordell Hamilton, Amy Hendel, Amber Henyan, Nathan Henyan, Marcos Hernandez, Ashley Renae Higgins, Cody Higgins, Dwight Jackson, Michaela-Kelly Jackson, Jennifer Jacuzzi, Paulo Jacuzzi, Charles Laskey-Castle, Michael Lingo, Adam Maritato, Laura Lynn Maritato, John McArtor,

Rosario McArtor, Travis Lee McQueen, Lindsey Brooke Mixon, Michael Parker, Michelle Parks, Robert Parks, Melvin Rivera, Yasmin Rivera, Timothy Rzasa, James Scoppa, Leah Michelle Scoppa, Patrick Sheridan, Brian Tennant, Ehren Tennant, Miriam Trebino, Christian Wuollet, Leigha Faith Wuollet, and Jerry Wyche.

76.    The list of OSIs which occurred before plaintiffs unintended discharges is in fact considerably longer given Sig's knowledge of subsequent multi-plaintiff P320 suits filed in this District and other suits in courthouses around the country before plaintiffs were shot.  Despite having full notice and knowledge of all these incidents all over the country, Sig said nothing and warned no one.

77.    Plaintiffs intend to introduce evidence of the final number of OSIs Sig knew about before plaintiffs were shot through Sig witnesses as well as through Plaintiffs' experts.

78.    A growing  number of these incidents  was captured on video, clearly depicting the P320 discharging, while in its holster, without the user's hands anywhere near the gun.

79.    A compilation of some of the obtained videos of P320s discharging without the user pulling the trigger can be viewed here: https://vimeo.com/1035626552/9a6b65d08f

80.    On July 24, 2023, Officer Daniel Witts, of the Montville, Connecticut, Police Department, experienced his P320 discharging while secured in its holster as he was bent over with his arms wrapped around a suspect's leg and nowhere near his gun.  A still image of the discharge can be seen below.



81.    On March 28, 2022, Officer Marvin Reyes, of the Houston Police Department, also experienced his P320 discharging while secured in its holster when he was reaching into his truck with arms extended and his hands nowhere near the gun. The muzzle flash from the discharge he experienced can be seen below.



Muzzle Flash

82.    On May 4, 2022, Detective David Cole of the Somerset County, Maine, Sheriff's Department was walking to his truck after serving a search warrant when his P320 that was secured in its holster discharged into his right leg.  He exclaimed "it just went off" and that it was in the holster.









83.     On May 9, 2024, plaintiff Currington of the LaGrange, Texas Police Department

nearly bled to death when his P320 that was secured in its holster discharged into his leg.  As had

Officer Cole in Maine, he stated "it just went off" shortly before being placed in the ambulance.





84.     On January 2, 2021, a holstered P320 discharged as an undercover officer was getting out of his vehicle, launching the gun out of the holster and into the side of an unmarked patrol car.



85.    On February 4, 2016, a fully holstered P320 discharged as a Michigan officer was exiting his car during a snowstorm.  While Sig claimed that a "seat belt" buckle had "made its way" into the holstered gun and pulled the trigger, a still frame of the bodycam shows nothing inside the holster immediately after the discharge.



86.    Tragically, Sig P320 unintentional discharges continue at an alarming rate putting its users at risk of death or serious bodily injury by performing everyday tasks.

87.    Upon information and belief, Sig is aware of several fatal incidents involving unintentional discharges of a Sig P320.

88.     To date, Sig has never issued a mandatory recall or safety notice regarding the P320 and continues to sell it.

89.     Sig's conduct including design, manufacturing and marketing decisions prioritized profits over the health and safety of its users and those in the vicinity of the P320.

## PLAINTIFFS' INCIDENTS

### Officer Currington Incident, May 9, 2024

### La Grange, Texas

90.     On May 9, 2024, at approximately 7:30 pm. Officer Currington was locking the gates at Northside Park in La Grange, Texas.

91.     Currington, an officer with 35 years of law enforcement experience, was walking between the gate and his police car when his fully holstered P320 fired a bullet into his right leg.

92.     At no time were Currington's hands on the holstered gun when it discharged.

93.     The bullet struck Currington in his right leg below his knee, hitting a major artery and his fibula bone.

94.     In extreme pain and distress, Currington managed to call for help on his radio.

95.     Officer Mitchell Maxwell arrived first to the scene and took over tending to Currington's profuse bleeding from a good Samaritan who had applied a tourniquet with a belt to Currington's leg.

96.     Maxwell applied a second tourniquet and removed Currington's P320 from its holster.  It was fully inside his duty holster and the spent casing of the round that fired was stuck inside the weapon's firing chamber, establishing that the gun was fully seated and could not properly cycle or eject the spent casing.

97.     Fayette County EMS arrived and transported Currington to Saint David's Hospital in South Austin.  A Travis County EMS commander met the ambulance along the way to deliver a unit of blood, who was close to death from the extreme loss of blood.

98.     Currington underwent immediate life-saving surgery.

99.     The bullet caused permanent nerve damage, macerated tissue, severed an artery, broke his fibula bone, and remains, in part, in his leg as doctors are concerned removal would cause more damage.  The injury was career-ending and nearly took his life.

### Officer Hunter Gally Incident, September 24, 2024

### Marble Falls, Texas

100.    On September 24, 2024, Officer Gally was standing beside his patrol vehicle in the Mable Falls High School parking lot preparing to work security for the school's homecoming football game.

101.    Gally, an eight-year veteran of his department and an elementary School Resources Officer, was assisting with the security of the high school.

102.    Gally frequently interacted with the students at the high school and the younger students while wearing his triple retention holstered Sig P320 at his side as he had earlier that day.

103.    With his passenger door open he reached into his car when his fully holstered P320 discharged a bullet into his right leg.

104.    Several students and a fireman responded to Gally after he fell to the ground.

105.    Surveillance footage from a nearby school bus shows that Officer Gally's hands were not on his holstered P320 when it fired.

106.    The bullet tore through Gally's thigh and lodged behind his knee.  He was airlifted out of the high school's parking lot and taken to the hospital.

107.    The bullet caused nerve damage, macerated tissue, and remains, in part, in his leg as doctors are concerned removal will cause more damage.

108.    In a press release dated September 23, 2024, Gally's department unequivocally cleared Gally of any wrongdoing, stating that he was not "manipulating the weapon in any way when it discharged inside the holster":



**POLICE DEPARTMENT**

PRESS RELEASE: 09/23/2024

On the evening of September 20, 2024, at approximately 6:00pm, a Marble Falls Police Department School Resource Officer was preparing to work the homecoming football game at Mustang Stadium. The officer parked and exited his patrol unit in the Visitor Parking lot. The officer was standing outside the passenger side of his vehicle when his department issued Sig Sauer P320 duty pistol inadvertently discharged while secured inside the holster. The officer was not manipulating the weapon in any way when it discharged inside the holster. The bullet penetrated and lodged in the officer's right thigh. Marble Falls Area Volunteer Fire Department Chief Thomas Jacobs was standing nearby and immediately began providing first aid to the officer. Jacobs, with assistance from several students who were standing nearby, applied two tourniquets to the officer's right leg. The officer was airlifted to Dell Seton Hospital in Austin by Air Evac Life Team 49, where he was treated for a gunshot wound. The officer has since been released from the hospital.





## COUNT ONE

## NEGLIGENCE

### (PLAINTIFFS KEVIN CURRINGTON AND HUNTER GALLY v. SIG SAUER, INC.)

109.    Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth herein.

110.    At all relevant times, Sig owed Plaintiffs the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user intending it to fire , before selling the gun and placing it into the stream of commerce.

111.    At all relevant times, Sig owed Plaintiffs the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without the user wanting it to fire, before selling the gun and placing it into the stream of commerce.

112.    At all relevant times, Sig owed a duty to Plaintiffs to unambiguously warn consumers and/or intended users of the P320, including each of them, of known or suspected hazards that rendered the gun unreasonably dangerous to handle or use.

113.    Sig knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of its own internal research and testing in 2013, including its later failure modes and effects criticality analysis in 2016 ("FMECA").

114.    Sig also knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of formal and informal reports and video evidence from civilian, law enforcement and military users, national media, and formal claims and lawsuits arising from substantially similar incidents, internal testing and research, industry publications and research, and other

sources of information to be developed in discovery, many years before the plaintiffs were shot and nearly killed.

115.    Sig breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.      By failing to use due care in designing the P320, failing to incorporate an external safety to prevent unintended discharges;

ii.     By failing to use due care in designing and manufacturing the P320's internal components to prevent un-commanded discharges;

iii.    By failing to issue a mandatory recall of the P320;

iv.     By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

v.      By negligently failing to unambiguously warn purchasers and end users of the gun, including Plaintiffs, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vi.     By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of Sig, and during which times its employees, servants or agents had an opportunity to inspect, service and work on the gun;

vii.    By misrepresenting and concealing, the dangers and hazards posed by the gun;

viii.   By minimizing quality control expenses;

ix.     By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

x.      By failing to incorporate necessary information, warnings, and instructions within the P320 manual and web pages;

xi.     By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xii. By failing to incorporate safeties which were standard among all of the P320s' competitors;

xiii. By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

xiv. By importing inexpensive MIM parts from India and other foreign countries and failing to secondarily machine the surface faces of critical internal components of the fire control unit, including the striker foot face and sear face, and

xv. Other negligent acts and omissions to be developed in the course of discovery.

116. Sig knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

117. The gun's defective conditions were not visible, and plaintiffs were not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

118. Sig's negligence, as alleged in this Count, directly and proximately caused the unintended discharges and injuries to plaintiffs.

119. As a direct and proximate result of the negligence set forth in this Count, plaintiffs suffered severe physical injury, mental anguish, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity. Plaintiffs have further incurred medical expenses, and other expenses and will suffer such losses and impairments in the future. The plaintiffs are entitled to enhanced compensatory damages due to the wanton, malicious and/or oppressive nature of the defendant's conduct.

## COUNT TWO

## STRICT PRODUCT LIABILITY

(PLAINTIFFS KEVIN CURRINGTON AND HUNTER GALLY v. SIG SAUER, INC.)

120.    Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth herein.

121.    Sig, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts as adopted by the New Hampshire Superior Court.  See Buckingham v. R.J. Reynolds Tobacco Co., 142 N.H. 822, 825-26 (1998).

122.    Sig is engaged in the business of selling firearms, including the P320.

123.    Sig expected P320s to reach the plaintiffs, and the guns did reach the plaintiffs, without any substantial changes in the condition of the guns as Sig sold them.

124.    Sig sold the P320s that caused harm to the plaintiffs in a defective condition unreasonably dangerous to the plaintiffs and each of them.

125.    The defective and unreasonably dangerous condition in which Sig sold the P320s at issue in this action directly and proximately caused the physical harm each plaintiff suffered.

126.    Sig is therefore strictly liable to Plaintiffs.

## COUNT THREE

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY PURSUANT TO RSA 382-A:2-314

(PLAINTIFFS KEVIN CURRINGTON AND HUNTER GALLY v. SIG SAUER, INC.)

127.    Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth herein.

128.    At all relevant times, Sig was in the business of marketing, selling, and distributing weapons, including the guns causing plaintiff's injuries.

129.    Sig knew of the ordinary purposes for which the guns were intended and impliedly warranted them to be of merchantable quality, safe, and fit for such purposes such as walking with the P320 holstered on the hips and all other reasonably foreseeable uses.

130.    At all relevant times, Plaintiffs used the guns in  their intended manner and for its intended purpose, reasonably relying on the skill, judgment and implied warranty of Sig.

131.    Sig breached the above-referenced implied warranties as to the gun because, at the time it left Sig's possession, it was not of merchantable quality and was unreasonably dangerous and unfit for the ordinary and reasonably foreseeable purposes for which it was intended and its reasonably foreseeable misuses by virtue of:

    i.     Failing to use due care in designing and manufacturing the P320's internal components, including its sear-striker connection, and by omitting a mechanical disconnect switch, so as to prevent un-commanded discharges;

    ii.    Failing to issue a mandatory recall of or safety warning for the P320 as Sig had done in the past with other defective products;

    iii.   Failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally as described above;

    iv.   Negligently failing to unambiguously warn purchasers and end users of the gun, including plaintiffs, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

    v.    Failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally while in the possession of Sig, and during which times employees, servants or agents of Sig had an opportunity to inspect, service and work on the guns; and

    vi.   Negligently failing to place a warning about the danger of mere "vibration" of the gun in a conspicuous manner, such as on its frame, which could be easily

understood by a consumer, instead of merely revising the bottom of page 25 of the gun's user manual, after several incidents of accidental discharges.

132.    Plaintiffs, as the end users of the gun, were persons who would foreseeably be injured by Sig's breach of the implied warranty referenced in this Count and Sig's breach of the warranty of merchantability as alleged herein, which breaches directly and proximately caused the defective discharges of their P320s and the resultant injuries.

133.    As a direct and proximate result of the breaches set forth in this Count, plaintiffs have suffered and continue to suffer damages in the amount of the difference between the value of the plaintiffs' P320s as warranted and the value of the P320s accepted by the plaintiffs, within the meaning of RSA 382-A:2-314, plus incidental and consequential damages including damages for personal injury as allowed by RSA 382-A:2-715.

<u>**COUNT FOUR**</u>

**BREACH OF EXPRESS WARRANTY PURSUANT TO RSA 382-A:2-313**

(PLAINTIFFS KEVIN CURRINGTON AND HUNTER GALLY v. SIG SAUER, INC.)

134.    Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth herein.

135.    At all times material hereto, SIG was in the business of marketing, selling, and distributing weapons, including the gun causing plaintiffs' injuries.

136.    Upon information and belief, Sig knew, or had reason to know, that the gun (i) would be situated in holsters that would be affixed to human waists by means of belts, (ii) that users and owners would walk around with p320s situated in holsters, and (iii) that the users were in fact relying on Sig's skill, judgment, and express warranty of the gun's fitness for those particular purposes and would not fire.

137.    Sig expressly warranted that the P320 would not fire unless the trigger was pulled.

138.    At all relevant times, plaintiffs used the gun in its intended manner, and for its intended purposes.

139.    Sig breached the above-referenced express warranty as to the guns in that they fired without a trigger pull and were unreasonably dangerous at the time it left SIG's possession by virtue of:

    i.    Failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, so as to prevent accidental discharges;

    ii.    Failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products;

    iii.    Failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally as described above;

    iv.    Negligently failing to unambiguously and conspicuously warn purchasers and end users of the gun, including plaintiffs, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

    v.    Failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally while in the possession of Sig, and during which times employees, servants or agents of Sig had an opportunity to inspect, service and work on the gun;

    vi.    Negligently failing to place a warning about the danger of mere "vibration" of the gun in a conspicuous manner, such as on its frame, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges; and

    vii.    Expressly warranting that the gun would not fire unless the trigger was pulled.

140.    As a direct and proximate result of the breaches set forth in this Count, plaintiffs have suffered and continue to suffer damages in the amount of the difference between the value of the plaintiffs' P320s as warranted and the value of the P320s accepted by the plaintiffs, within the

meaning of RSA 382-A:2-314, plus incidental and consequential damages including damages for personal injury as allowed by RSA 382-A:2-715.

## COUNT FIVE

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

(PLAINTIFFS KEVIN CURRINGTON AND HUNTER GALLY v. SIG SAUER, INC.)

141.    Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth herein.

142.    Upon information and belief, Sig had knowledge of serious design and manufacturing defects in the commercial version of the P320 gun more than eight years, if not longer, before plaintiffs were shot in May and September 2024.  It had knowledge of scores of un-commanded discharges as well, many of which were directly reported to Sig and input into its Oracle RMA system for tracking customer complaints and incidents.

143.    Despite having such knowledge, which included almost 200 incidents of reported un-commanded discharges before plaintiffs were shot, Sig failed to issue a mandatory recall of the gun despite the ability to do so, which would have prevented the severe injuries to plaintiffs.

144.    Had Sig acted responsibly and repaired the defects in the commercial version of the P320 when it first became aware of them, or had Sig issued an unambiguous, nationwide safety warning, plaintiffs never would have been shot.

145.    The bullets unintentionally discharged from the P320s easily could have taken Plaintiffs' lives, and that of any bystander near either Plaintiff at the time of discharge, including schoolchildren.

146.    Sig's acts and omissions as alleged herein endangered the safety and lives of end users of its products because Sig sought to save millions in repair costs, and avoid tarnish to its

corporate image by omitting to institute a mandatory recall as it had done for other defective Sig weapons, choosing instead to implement a woefully inadequate "voluntary upgrade program" that did not solve the problems with the gun.

147.    Sig's conduct in this matter as described herein was extreme and outrageous such as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community.

148.    Through Sig's extreme and outrageous conduct, Sig intentionally or recklessly caused plaintiffs severe emotional distress, as well as severe physical injury.

149.    As a direct and proximate result of the tortious conduct set forth in this Count, plaintiffs suffered severe physical injury, fear of imminent death, nightmares, mental anguish, inconvenience, traumatic stress, sleeplessness and trauma associated with the same.  The plaintiffs are entitled to enhanced compensatory damages due to the wanton, malicious and/or oppressive nature of the defendant's conduct.

## COUNT SIX

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

(PLAINTIFFS KEVIN CURRINGTON AND HUNTER GALLY v. SIG SAUER, INC.)

150.    Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth herein.

151.    Sig owed a duty of care to the plaintiffs, and end users of the P320 generally, to ensure that the P320 was free of design and/or manufacturing defects that could cause the gun to discharge without the trigger being pulled.

152.    Sig further owed a duty of care to the plaintiff, and end users of the P320 generally, to notify them of such defects in the P320 that could endanger them.

153.    In addition, SIG owed a duty of care to issue a mandatory recall of P320 guns, given Sig's prior notice and knowledge of design and manufacturing defects imperiling the lives and safety of end users.

154.    Sig breached each its duties of care owed to the plaintiff, foreseeably causing the plaintiffs severe mental and emotional distress, including fear of imminent death, accompanied by objective physical symptoms.

155.    As a direct and proximate result of the breaches set forth in this Count, plaintiffs suffered severe physical injury, nightmares, mental anguish, inconvenience, traumatic stress, sleeplessness, anxiety and trauma associated with the same.  The plaintiffs are entitled to enhanced compensatory damages due to the wanton, malicious and/or oppressive nature of the defendant's conduct.

## COUNT SEVEN

### LOSS OF CONSORTIUM

(PLAINTIFF TERRI JEAN CURRINGTON V. SIG SAUER, INC.

156.    Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth herein.

157.    At all relevant times, plaintiff Terri Jean Currington was the lawful spouse of plaintiff Kevin Currington, who sustained severe and permanent injuries due to the negligent and/or wrongful acts of defendant Sig.

158.    As a direct and proximate result of Sig's actions and the injuries sustained by her spouse, plaintiff Terri Jean Currington has suffered and continues to suffer the loss of consortium, including the loss of services, society, and marital relations.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff respectfully requests that this Court:

The plaintiffs demand a trial by jury on all counts.

A.      Schedule this case for trial by jury, and after trial;

B.      Find the defendant liable for negligence;

C.      Find the defendant liable for strict product liability;

D.      Find the defendant liable for breach of the implied warranty of merchantability pursuant to RSA 382-A:2-314;

E.      Find the defendant liable for breach of express warrant pursuant to RSA 382-A:2-313;

F.      Find the defendant liable for intentional infliction of emotional distress;

G.      Find the defendant liable for negligent infliction of emotional distress;

H.      Find the defendant liable to the plaintiff Terri Jean Currington for loss of consortium;

I.      Award the plaintiffs damages for lost earnings and lost earning capacity;

J.      Award the plaintiffs damages for medical expenses;

K.      Award the plaintiffs compensatory damages for such damages as physical injury, pain and suffering, emotional distress and loss of enjoyment of life;

L.      Award the plaintiffs enhanced compensatory damages;

M.      Award the plaintiffs damages for the difference between the value of Plaintiffs' P320 guns as warranted and the value of the P320s accepted by Plaintiffs; and

N.      Award the plaintiffs interest and costs; and

O.      Grant such other and further relief as is just and equitable.

Respectfully submitted,
KEVIN CURRINGTON,
TERRI JEAN CURRINGTON, and
HUNTER GALLY,
By their attorneys,

Date:  January 13, 2025          By:    /s/ Benjamin T. King
                                        Benjamin T. King, NH Bar #12888
                                        DOUGLAS, LEONARD & GARVEY, P.C.
                                        14 South Street, Suite 5
                                        Concord, NH 03301
                                        (603) 224-1988
                                        benjamin@nhlawoffice.com

                                 and

Date:  January 13, 2025          By:    /s/ Jeffrey S. Bagnell
                                        Jeffrey S. Bagnell, CT Bar #18983
                                        (pro hac vice admission to be petitioned)
                                        JEFFREY S. BAGNELL, ESQ., LLC
                                        55 Post Road West, Second Floor
                                        Westport, CT 06880
                                        (203) 984-8820
                                        jeff@bagnell-law.com